Next case on this morning's backet is the case of Randy Robinson v. Orthotic & Prosthetic Labs, Inc. and we have Colleen Mall from the Appellant and Anthony Gilbreth from the Athlete. And you may proceed when you're prepared to. Please be seated. Your Honor, may it please the Court? My name is William Wall and I represent the defendant, O&P, in this appeal. The facts of this appeal are straightforward and they're not in dispute. In January 20, 2013, the plaintiff of record at the time of settlement, Randy Robinson, died. In September and November of 2013, the purported counsel for the plaintiff of record engaged O&P in settlement talks and the settlement talks led to an agreement as to a settlement amount. Shortly after the settlement amount was agreed upon, it was finally revealed to O&P that the plaintiff of record had died 8 months previously. O&P advised counsel that it could not go forward with the settlement agreement given the fact that the plaintiff's death wasn't disclosed and they believed that the plaintiff's counsel didn't have the authority to enter into the settlement at the time given the plaintiff's death. One month later, the purported counsel for the plaintiff of record moved to substitute Matthew Robeson as the plaintiff of record in the case and also moved the Court to enforce the settlement order. The Court granted that order in January of 2014, leading to the incident appeal. Now, the circuit court's order enforcing the settlement agreement should be set aside on two separate and independent grounds. The first of those is that there was either a misrepresentation, tacit or otherwise, or an affirmative duty to disclose the death of a client during the course of settlement talks. Now, it's black letter law that settlement agreements are not valid if they're based on a misrepresentation or an omission of a material fact that counsel has a duty to disclose during the course of settlement talks. And both exist in spades here. For one, I said both a duty and a misrepresentation. You have to speak up. I can't hear you. I apologize. Both a duty and a misrepresentation exist in this case here. For one, there was a duty under the Illinois Discovery Rules. Illinois Discovery Rules require accurate answers to RFPs and ROGs and other discoveries served. They require parties to provide a witness list to the other side with contact and address information. And they require the parties to list the subjects of the testimony that those witnesses will testify to. In this case, the rules also require that those disclosures be seasonably updated. Now, Plaintiff of Record in this case died again in January of 2013. An O&P wasn't advised of my death until November of 2013. Were there interrogatories out there pending? They weren't pending, Your Honor. They had already been answered to my recollection. Go ahead. My point on this is that it's not only the rule doesn't require only answers to interrogatories and requests for production. It actually requires the production of a witness list as to witnesses that will testify at trial, their contact information, and the subjects of their testimony. That's under 213F? Yes, it is. And did you have a 213F interrogatory out there? Yes, we did. So there is no time limit for that disclosure, right, for supplementing that disclosure? I believe the disclosure had already been made, but the rule requires that it be seasonably updated if circumstances change. I was wondering why you didn't cite the statute on suggestion of death. That seems to provide a much better argument for you than seasonably updating your interrogatories. We also cited a suggestion of death point in our reply brief as well, and that it would require prompt substitution. So as to both advise as a form of informing O&P that there was a death and also conferring the authority upon counsel to actually act in case. Well, yeah, and it gives you a time limit, 90 days. The suggestion of death is within 90 days after the appointment of the special administrator. They have to notify heirs, et cetera, et cetera. But it clearly imposes a duty, you agree with me, to disclose the death under 735 ILCS 5-2-1008. Yes, and we did rely on that point in our brief as well. In your reply brief. Your brief seems to talk about answers to interrogatories. Well, I believe the discovery rule is one source of a duty among many others in this case that would have required the purported counsel of record to disclose the death of his client during the settlement talks. The discovery statute is one, in my opinion. There is a separate one, and that is of the case law of this court, of the disciplinary commission,  In Washington, this court was faced with the alternative argument by an appellant that a settlement agreement should be set aside because the death of the client wasn't disclosed during the course of settlement talks. And in that case, the court didn't assume that a duty didn't exist to disclose. It said there was a duty, and held in that case, the facts of this case, that the duty wasn't breached because there was no indication that the counsel at the time of the settlement talks knew of his client's death. Is there an ARDC manner pending in this? Not to my knowledge, Your Honor. But was it reported to ARDC? And did counsel or the court under Himmelfield in need to report? I don't think it was reported because it was affirmed. It was enforced. Counsel, what's your response? I am not aware of a report to ARDC in this case, Your Honor, and I don't believe it's included in the record. Do you believe that you have an obligation to report in this case? In this case, the focus of our argument is not ethical. That doesn't answer her question. You're a mandatory reporter. Yes, I am. And you're arguing an ethical violation. What I'm arguing, Your Honor, is that under the context of settlement, which settlement is a contract, that there are certain duties that arise during the course of settlement talks, and that in certain circumstances, the failure to disclose or the failure to correct a tacit point might qualify as a misrepresentation. I don't know if the circumstances here rose to the level of sanctionary. Now, I know after we've— We're not talking about sanctions. We're talking about ethical violations. We're talking about your duty to report. Do you think you have a duty to report this when you allege ethical violations? I think that was just a swarmed question. I know that this was consulted within our firm, and the firm made an affirmative decision where the other two report or not report the issue. And so there's been no reporting? Not that I'm aware of. But I believe the thrust of this case is something less than a sanctions case, and it's more about what counsel has a duty to do during the course of settlement talks. And as I pointed out, this court in Washington impliedly held that there was a duty to disclose during the course of settlement talks. If counsel knows of the death, knows of the death, and the plaintiff took record, he has a duty to reveal it to the other side during settlement talks. And that holding has been echoed by a number of other courts. The federal courts have held in Verzi that the counsel is required to disclose to opposing counsel the decline to die, and the failure to do so compels the court to void a settlement entered into without disclosure of death. Now, that holding was echoed by a number of other state supreme courts. In Geisler, the Kentucky Supreme Court said that the failure to disclose the death of a client during settlement amounts to an affirmative misrepresentation. Forrest, same thing. New Jersey Supreme Court held similarly. And I think all of these holdings, Washington's holding in this court and these other four holdings, state of policy preference, at least in the settlement context, that it makes little sense to allow a client, when they're engaged in settlement, to hide the fact of something substantial as the death of a plaintiff or broker during the course of settlement. Because that fact will affect the settlement offer, and it will at least affect the settlement amount. Mr. Wall, not to beat a dead horse, but you have a whole section on ethical duty to disclose, where you cite ARDC cases and contend that there is an ethical violation under the rules. But yet you're saying that you don't feel that you have a duty to advise the ARDC of what you are contending is an ethical violation. I have two responses to that point, Your Honor. The first response is that our reply brief focuses primarily on- I'm not talking about winning this case on appeal. I'm talking about a duty that we all, that practice law, are aware of that we have with respect to being made aware of ethical violations. Of course, and if I could just respond to two points. Number one, the citations throughout our reply brief that discuss the rules were designed to refute the arguments brought forth by plaintiff's counsel in his opposition brief. We do not, and I believe I said this in the reply brief, see this as a case about sanctions. Rather, we see this as a case about what a party has to disclose, or what misrepresentations a party has to correct during the settlement context if he wants the luxury of having a settlement agreement, of course. But to answer, to more directly answer your question about reporting, as I explained a moment ago, it is to my knowledge that this matter was discussed with our firm and our firm's ethics advisor, and a decision was made as to whether or not to report. And to my knowledge at this time, the matter was not reported. Okay, thank you. Now, I also believe that there is- I'm going to go ahead with my question, if you don't mind. Yes, ma'am. In the Washington case versus Caseyville, which came out of this court, it states that when the client dies, the attorney's employment and his authority is actually revoked. Yes, Your Honor. By the death. In other words, there's no authority for the attorney to even negotiate. Yes, Your Honor. So getting back to Justice Chapman's issue again, I'm having a hard time understanding why if the authority is revoked and yet the lawyer continues to negotiate without informing you, how that in your mind is not a substantial misrepresentation that requires reporting. Here you have someone who has absolutely no authority, doesn't inform you, and yet you as an attorney practicing law in Illinois don't tell the ARDC about it. I don't understand that. Well, I believe the applicant- I mean, your firm discussed it, but that's not an answer. Well, I believe the appellee has made- and not to make his argument for him- I just thought I didn't- I'm sorry. Say that sentence again. I'm sorry. Not to make the appellee's argument for him, but I believe the appellee has pointed out in his brief that he was potentially acting at the behest of the estate at the time of the plaintiff's death. But doesn't that make it worse, the fact that he actually knew there was an estate opened? I think it was in July, and you weren't notified until, I think, November. November. So he was actually involved in the estate as of July and still didn't tell anybody. I think the argument would go that he had the authority to act based on his employment by the estate. But we're not talking about his argument. We're talking about your duty to disclose if you believe there is an ethical violation, not what their argument, their response is. That's for the ARDC to decide. In the context of Judge Case's question, my point is that there could be the potential argument that there was some authority here for him to act. So do you believe there was authority for him to act? I would like to clarify that there could be potential authority to act generally, but his authority to act in the case wouldn't be triggered until there was a formal substitution. And that's the second point, our second reason for wanting the enforcement order set aside. Because even if Plaintiff's Counsel had some limited authority to act by virtue of representing the estate, it wouldn't be triggered within the specific case until that plaintiff was actually appointed as an administrative in that case. What's the difference between what you're talking about and just the word lying? If somebody lies to you clearly in our ethical rules, that's a violation, wouldn't you say? Well, our estimation in this case involves two things, a tacit misrepresentation. Tacit? Tacit. Just like tacit meaning accidental? The reason I use the word tacit is because in this case, at the time of settlement talks, the reported counsel for the plaintiff of record stated that he was representing his quote-unquote client. And there is law in Illinois stating that a court and counsel have the ability and are freely allowed to presume that an attorney is acting under the authority for the client whom he professes to represent. Well, at that point, he would have been professed to represent Randy Robeson because he entered his appearance for Randy Robeson. And in settlement discussions, by not correcting that misrepresentation, that's what I meant by tacit misrepresentation. Isn't that at odds with your position that in the law that says your authority to act to represent a person is revoked upon death? I don't see an inconsistency there, Your Honor. You don't see any inconsistency? Maybe I just don't understand the question. I don't see any inconsistency there. Our position is that there's either been a misrepresentation by purtuit of that fact or a general affirmative duty to disclose even if there was a misrepresentation. The whether or not you actually have authority to act in the case is a separate point and a separate basis for ruling that the enforcement order should be vacated. Now, as I've said, I believe there is significant authority out there to support the fact that there was an affirmative duty to disclose the death of a client during the course of settlement talks. Washington impliedly holds it. A number of other jurisdictions expressly hold it. And it makes good policy sense. But there's also the question of whether or not there's been prejudice flowing from that failure to disclose. And I would argue that there was. Here, a number of courts that have addressed this question of failure to disclose the death of a client during settlement talks is a fact that has such gravity that it is per se prejudicial. But the appellee has admitted prejudice in this case. He states that his nondisclosure was, quote, not solely calculated to maximize the settlement value. That means that it was partly calculated to do so. But he had no authority to do that. Regardless of what his intentions were, which maximizing settlement value is the intention of every injury lawyer representing a plaintiff, his authority under the Fifth District case law is revoked upon death. So regardless of what his intentions are, he had no authority. And that is true. If this court holds that he did not have the authority to engage in those settlement talks, agree to a settlement amount, then the settlement agreement has to be vacated on that separate basis alone. But as to this point, as to prejudice, semantics aside, I think there is significant evidence of prejudice in this case. For one, the plaintiff had pleaded ongoing pain and suffering damages. Those damages would have abated as of his death in January of 2013. Which means that number no longer would have been on the table after that point. And that number certainly impacted OMP's settlement offer. And moreover than that, Randy Robeson's unfortunate death, which was unrelated to this case, would have caused proof issues for the new plaintiff's trial. Because Randy Robeson would not have been available to testify. And even if deposition testimony would have been sufficient to satisfy all of the elements of the case, it still would have been a poor substitute for an actual living plaintiff signing his damages and discussing his injuries with the jury. Now, as we've already discussed briefly, there is a separate and independent basis to set aside the circuit court's order enforcing the settlement. And set aside that order and remand the case to the court below. And that's that Illinois courts have recognized significant limits on a counsel's authority when a plaintiff dies. But IA said that an attorney's employment is authority over a vote by the death of his client. So an attorney cannot proceed where he does not represent the plaintiff. And as Judge Gates pointed out, the court held very similarly in Washington. But on other courts and other jurisdictions on facts even more similar to this case, have said that when a defendant advances an offer to a plaintiff of record, only the plaintiff of record or his proxy can accept it. In Smith, New Jersey Supreme Court said that the lawyer's agency ceased on the death of the client, along with his concurrent authority to settle. It wasn't restored by the representation of a personal representative, at least until the representative was appointed in the case. The offer was made to the plaintiff and not the estate. So it couldn't be accepted by counsel to plaintiff after plaintiff's death. And Jones, Gallup, and the court held the same. For both of these reasons, Your Honor, we request that the appellate court set aside the order enforcing the settlement agreement and remand the case for proceedings consistent with this opinion. Thank you, Mr. Waldron. We have the opportunity for rebuttal. Mr. Dilbreath? May it please the court. Excuse me. My name is Anthony Dilbreath. I represent the plaintiff, Apollina, in this matter, for the Providence-Gagas law firm in Columbia, Illinois. But not the attorney you represented in the actual case? I'm sorry? Did you represent? Yes, Your Honor. In the actual case? Yes, Your Honor. Okay. I think as the, well, the questions of the court for the appellant have sort of guided me a little bit on the issues that are before this court that are important to this court. I was going to deal with authority briefly, because I think it's, in my opinion, it's relatively easily dealt with, and then we'll move on to the duty. Whether or not I or our firm had a duty to disclose the information to opposing counsel in the course of this matter. First, on the matter of authority, I don't have any argument that I have authority to act on behalf of Randy Robinson after he died. That would be kind of a silly argument to make. It is. Pardon me? It is. Well, I think so. I mean, I don't think I can say that I can continue to, a deceased person can't authorize me to do things or not do things. I just, I don't see how that can happen. But our office did represent the estate and represented the independent administrator of Mr. Robinson's estate. At what point in time? At a time that, well, frankly, we learned of Mr. Robinson's death through him. We didn't know about it until he contacted us and said my father passed away when he did. And I mean. When did you know? I don't recall the date, Your Honor, but it was around the time of his death. Well, so the only thing that I saw in the briefs is that you were involved in the estate in July. That's. I'm sorry. I didn't let you finish your question. So he died in January. And so I'm asking was it from July that you learned or was it in January? No, Your Honor. It would have been closer to January. I don't remember exactly when. And you were actually retained by somebody. When was that somebody given authority to act? By, he was appointed administrator by the Missouri Probate Court in August of 2003. August. So from January to August you were involved in negotiations, correct? No, Your Honor. There were no negotiations that went on from January to August. No, Your Honor. And, frankly, I couldn't until that administrator was appointed by the Missouri Probate Court. Negotiations did not occur until after he was appointed as the administrator. That's when negotiations occurred. And that's reflected in the record. And when would that be? What month? August of the negotiations. Yes. Very shortly after he was appointed. Around August. I believe the date is August 27, 2003. And you did not believe that you had any duty to disclose that your client was no longer alive? No. What about the suggestion of death? The suggestion of death and the annotations, and that was erased in a held brief, so I don't have authority handed to the court, but on the annotations on the suggestion of death statute, there is no, and I'm a candidate, I looked for this, there is no timeline on the filing of the suggestion of death, but within 90 days after the filing, you have to have the party substituted lest you risk dismissal of the action. Frankly, we were having trouble getting the family together to get their house in order with regard to Mr. Robinson's estate. Had I immediately filed the suggestion of death upon knowing, I risked dismissal of the action on behalf of my former client, Randy Robinson, and my potential and ultimate client, Matthew Robinson, administrator of the estate. You didn't represent Randy Robinson at that point, did you? Not after he died, but he was my former client, I would do to him as a former client anyway. And that's the crux of my brief, is if we're going to call this an ethical issue, then we have to look at all the ethical issues involved for our office. And that's – You had a duty not to disclose his death. I learned of the death through a confidential communication with a client, moral potential. And you believe that it was accurate? The what? The death. That he had passed away? Yes. Yes, you're right. Yes, I did. So it doesn't matter how you learned about it. And you believe that you had a duty not to disclose that death. I believe I could only disclose that information if authorized by my client. And at the point he died, who was your client? Well, when we were advised of it, we were advised of it by a potential and ultimate client, Matthew Robinson. And the reason why you didn't think that you should disclose it was why, again? Because, again, it was learned in a confidential communication from a potential client. And we believe we had a duty to not disclose – if the question were directly put, we absolutely – if one is asked, is Mr. Robinson alive, there's no doubt that we cannot affirm the testimony. You had all kinds of means and ability to verify it, which I'm sure that you did. And so you can't be claiming that you didn't disclose it just because it was a confidential source. Well, but we didn't have authority from the client to disclose the information. I mean, I – Have you read Himmel lately? Have I read Himmel? I haven't read the case lately, Your Honor. I'm familiar with it. I recommend that both of you read Himmel. Counselor, I just want to follow up on one question, and I think we're all thinking the same thing. Himmel put certain requirements on attorneys and judges to report. Did you self-report? No, Your Honor. Okay. That's the one thing we need to know on determining – I understand. – on our separate obligations aside from ruling on this case. This – I mean, if we get to the – to get to the heart of the matter, this was not something that I relished. This was not something that I took lightly. This was not something that – and I don't know if this matters to the court at all. But this is not something that I withheld because I thought it might be great. I did what I felt compelled to do under the rules when I consulted the rules. And I did not do what I wanted to do. Did you consult the rule 8.4, misconduct, under our ethical rules? I am familiar with that rule, Your Honor. You are familiar. I am, Your Honor. So you know that misrepresentation is a violation of the Illinois Rules of Professional Responsibility. I do know that, Your Honor. And you have not self-reported. I do not believe that I made a misrepresentation. I do not believe I had an affirmative duty. I could not locate any authority that gave me an affirmative duty to disclose it, and therefore I did not disclose it. And I do not believe that – since I did not have an affirmative duty to disclose it, I do not believe I committed a misrepresentation. You know, I'm interested by your comment that you thought you had a confidential – what did you say? A confidential communication from a client. Confidential communication from a prospective client. Correct. Not a client. When do you think that the confidentiality attaches? Immediately, Your Honor. Even if there's no client? Correct. Okay. And that's – do you want me to talk about the rule or no? The rule of confidentiality? No, Your Honor. I didn't mean that to – the rule about duties to prospective clients. No. Okay. I understand your answer, but you know that death is covered record. How can it be confidential? Well, for example – It's reported in the newspaper. I guess I would liken it to – well, it was – well, it doesn't matter. I would liken it to a criminal case where, for example, if you've got a client that's had a DUI conviction previously, and in the course of negotiating the claim or the file, your client has offered a first-time offender DUI. Nobody asks whether he had a prior conviction. It's the offer. The offer is made. And unless it's put to the attorney, the attorney doesn't have a duty to disclose detrimental information that's detrimental to the client. I think that's – you hit the nail on the head, detrimental. It was detrimental to your case to disclose his death. It was potential. There's no question about that. It was potential, certainly. It wasn't worth the same value, potentially. Potentially. May I? Yes. Yes. And you knew that at the time you negotiated, and so you made an affirmative decision not to tell. I can't deny that. That's right. That's right. So you didn't tell because you wanted to make more money in the settlement. Obviously, you had pain and suffering that you could argue in the settlement that you didn't have if he died. But you might have had if you had a survival action. What I would – in response to that, Your Honor, what I would say is that the decision, in all camera, the decision not to disclose the information was not made for the purpose of maximizing value. I thought that's what you just said. It was. What I acknowledge is that there was some likelihood that it would diminish the value of the claim. I put that to the client. At the time the client was appointed, I put it to the client. I said, this is the way I see the lay of the land. When did you actually substitute the special administrator into the court in Illinois? The motion was filed December 30, 2013. I'm sorry? December 30, 2013, the motion was filed. December 30th of 2013 is when you asked for the special administrator to be admitted? Yes, Your Honor. When was – a special administrator is appointed under Illinois wrongful death. The laws in Missouri are very different than here. He was appointed as special – he was appointed as personal representative. The substitution statute uses the language, I believe, not special administrator but special representative, I believe, Your Honor. Yeah. In Missouri, everybody can file on death. All the family can file. There doesn't have to be, you know, one person. A special administrator is a creature of the Illinois Wrongful Death Act. Right. So what did you appoint in Missouri? In Illinois. No, didn't you say the estate was in Missouri? Yeah, but he was appointed a personal representative in Missouri. Okay, so he was appointed a personal representative in Missouri when? August 27, 2013. August 27, 2013, and you were involved in that? Correct, Your Honor. But you didn't tell anybody about that authority that you had until 12-30, 2013? It was prior to that informally, but that's the first motion that was filed before. And what was that motion? Motion to substitute the claim together with the motion to enforce the settlement. Right. It looks like you started – at least the claim is you started negotiations in September. Is that true? That sounds correct, Your Honor. Was there some – on the other side of the river, was there some fighting or something going on amongst the family that it took so long to get the person appointed? There was – you mean in August, between January and August? Yes, sir. There were issues with – there was some amount of discord in the family, and there were issues with getting – again, getting the person who had agreed to be personal representative to provide appropriate information so that would happen. So notice requirements and things like that in Missouri? Correct. I mean, essentially, correct. Sending out notice of death to all the relatives and letting them come in and – I mean, I didn't handle that portion of it. Who did? Another lawyer in my office. But it was still your firm. That's correct, Your Honor. But I didn't personally – I don't have enough firsthand knowledge of it to be able to tell you, Judge, I'm sorry. Okay. But the knowledge of your firm is attributed to you. No choice about it, Your Honor. Okay. Thank you. And when did you first tell Orthotic and Prosthetic Lab that the client had died? After we had agreed upon a favor. And what was that? It said release, and I sent the release back. It said this is the person who's going to have to sign the release. Right. Well, that was sometime between September and December. Do you know when that was? I can tell you, Judge. Okay. Okay. Okay. Okay.  Sometime prior to November 18th, I don't have the – I thought the email was in the record, Your Honor, but I don't see that it is. Sometime prior to November 18th. So sometime prior to November 18th, you reached a settlement? Correct, Your Honor. And it was in the exchange of the release proposals that you finally said, well, my client can't sign it because he's dead. That's correct. How long did you wait then between that statement, my client's dead, and informing the court on December 30th, 2013, that you had a special representative? Well, the motion to substitute the plan would have been the first communication with the court. But how about with the defendant?  Well, you told the defendant at some point after November 18th? Prior to. Sometime prior to November 18th. You reached a settlement. We reached a settlement and prior to it, between the time we agreed upon it and some day prior to November 18th, it was – You also told him. Correct. Okay. Correct. That's correct. So you waited a month and a half to put any legal documents into the court after you told him? Well, I mean, yes, we didn't file anything between that time and December 30th. And based upon what you've told us here in the last few minutes, you don't believe any of the failures to communicate death to the defendant was a misrepresentation under our rules of professional responsibility? No, because I did not believe I had an affirmative duty to disclose it. And where does your belief come from? How do you justify that? Well, I didn't – I couldn't find any authority for the – I've got a duty to a client. I've got my clear black-letter law duties to my clients. Right. And so that was my base. And I attempted to locate authority that said, you have an affirmative duty to disclose this information. You have to do it. I couldn't locate it. Did you look at the civil practice statutes? On? I mean, on the substance abuse. Suggestion of death? Yes, Your Honor. And I looked at the annotations on the suggestion of death to determine whether I had a timeline within which I had to file that. And I could not locate a timeline within which I had to file it or notify anyone else. I saw the timeline on 90 days, and the annotations make it clear that that 90 – in fact, the annotations express the state. You don't – there's not a timeline on when you – and even in the Washington case before this court, the suggestion of death wasn't filed until – it wasn't the issue. That was an interesting case because there were two substitutions actually. The first substituted plaintiff passed away, and it was after the substituted plaintiff passed away, they had to substitute a second plaintiff. But the first suggestion, when the initial, the name plaintiff died, wasn't made for a year after the plaintiff died. Now, I don't know what circumstances were going on behind the scenes, but the suggestion wasn't filed. So I couldn't locate anything that said, do you have to do this? You have to affirmatively – you have to voluntarily disclose information that you've learned in this capacity. And I think what distinguishes the circumstances here from all the other authority that's been cited is we represented everyone involved. Now, I'm not trying to hide behind that. I'm not trying to shield myself with that.  What do you have to do, and what is it, and when do you have to do it? And I couldn't find it – without finding any authority that says, you have to go out and do this now, I thought I would be reaching a duty to a client by doing something that I wasn't authorized to do. So you ended up representing all of the family in the Missouri proceeding. We're handling the estate. We represent the administrator. Do we represent the heirs and their individual capacities? No, probably not, but we have a duty to that. I understand. You opened a formal estate then in Missouri. Correct. Okay. So let's suppose – I agree with you that from January, the time of death, until 8-27-2013 when the representative was appointed, nothing was going on, you weren't negotiating, so there was no duty, right? I think that's true. That's what you're arguing. Certainly. But certainly in September when you began trying to settle the case and you had the authority from the special person appointed in Missouri, you don't think you had an obligation from September through November when you're negotiating to tell the other side that your client is dead? I did not have authority to disclose it from my client. I could not find affirmative authority that said I had to. You think you need authority from your client to tell the other side that, hey, my client's dead, you can't pay me for pain and suffering anymore? To me that seems to be a damages issue that would be addressed. It certainly is. I mean, it is, and I understand that. And it's something you negotiate for and ask for money. I understand, but again, if I can't locate something that says this is mandatory, you have a mandatory disclosure obligation here. I think I'm playing with fire, in such words, to disclose it without my client's authority to do that. And I'm not trying to split hairs. I'm truly not. I consider myself to be in a difficult position, and we made the decision we thought we had to make based on what was in our client's best interest. Oh, it definitely was in your client's best interest. Well, and again, I'm really not trying to make light of the situation. Do you want me to finish? You may finish your sentence. I mean, I'm not trying to make light of this situation. I don't consider it something that should be taken lightly by myself or anybody else. I don't. Okay. Thank you. Thank you. Mr. Wall, you have the opportunity to question. No, Your Honor. The person in the court will wait. Thank you both for your arguments and briefs. We're going to take a brief recess at this time.